**F I L E D**
CLERK, U.S. DISTRICT COURT

4/19/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAM _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:22-cr-00154-SB |
| Plaintiff, | |
| v. | I N D I C T M E N T |
| IMRAN SHAMS and LOURDES NAVARRO, aka "Lulu," | [18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud; 18 U.S.C. § 371: Conspiracy to Defraud the United States and to Solicit, Receive, Offer, and Pay Illegal Remuneration for Health Care Referrals; 42 U.S.C. § 1320a-7b(b)(2)(B): Illegal Remuneration for Health Care Referrals; 42 U.S.C. § 1320a-7b(a)(3)(i): False Statements to Secure Health Care Payments; 18 U.S.C. § 1956(h): Conspiracy to Commit Money Laundering; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(7), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| Defendants. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   'Matias' Clinical Laboratory, Inc., doing business as ("dba") Health Care Providers Laboratory ("Matias"), was a clinical testing laboratory located at 14411 Palmrose Avenue, Baldwin Park, California 91706, within the Central District of California.

2.   Defendant IMRAN SHAMS was a resident of Glendale, California, within the Central District of California, and New York. Defendant SHAMS was married to defendant LOURDES NAVARRO, also known as "Lulu," who was also a resident of Glendale, California, and New York.

3.   Defendants SHAMS and NAVARRO owned, controlled, and operated Matias.

4.   Individual A and Individual B were, at various times, listed on business records and corporate filings submitted by Matias as President, Vice President, and Chief Financial Officer of Matias.

5.   Until in or around May 2019, Matias maintained a bank account at Wells Fargo Bank, N.A. with an account number ending in 7139 ("WF x7139").  Beginning in or around May 2019 and continuing to the present, Matias maintained a bank account at East West Bank with an account number ending in 5549 ("EW x5549").  Defendants SHAMS and NAVARRO controlled the WF x7139 and EW x5549 bank accounts.

6.   Wells Fargo Bank, N.A. and East West Bank were financial institutions as defined in 18 U.S.C. § 20.

7.   Marketer A was an owner of a purported marketing company.

The Medicare Program

8.   The Medicare program ("Medicare") was a federally funded health insurance program, affecting commerce, that provided benefits to individuals who were 65 years and older, and to certain disabled persons.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").  Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b) in that it was a public plan or contract affecting commerce, and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

9.   Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique number.

10.  Physicians, clinical laboratories, and other health care providers that provided medical services to beneficiaries that were to be reimbursed by Medicare were referred to as Medicare "providers."

11.  Medicare was divided into different program "parts": Part A, Part B, Part C, and Part D.  Medicare covered clinical laboratory services for those beneficiaries who were eligible for Medicare under Part B.

Laboratory Testing

12.  Clinical laboratories performed various types of tests, such as toxicology screens, urinalysis, routine blood work, and tests for respiratory pathogens.  These tests were performed on urine, blood, and saliva samples, and nasal swabs ("specimens").

Physicians, nurse practitioners, and other authorized providers could issue orders ("doctors' orders") for laboratory testing for Medicare beneficiaries and other patients.

13.   Laboratories could perform tests to detect whether an individual had the novel coronavirus disease 2019, commonly referred to as COVID-19.  Laboratories could also perform tests to detect a variety of viral and bacterial respiratory pathogens.  Tests for respiratory pathogens were sometimes performed in panels that targeted multiple pathogens, known as a respiratory pathogen panel ("RPP").  RPP testing typically did not test for COVID-19.

14.   In general, the amounts Medicare reimbursed laboratories for RPP and other respiratory pathogen testing was several times higher than the amount it reimbursed for COVID-19 testing.

Medicare Coverage

15.   Medicare paid for claims only if the items or services were medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented.  Medicare would not pay for items or services that were procured through kickbacks and bribes.

16.   On January 31, 2020, HHS declared that, in light of confirmed cases of COVID-19, a public health emergency existed nationwide.

17.   In or around May 2020, in response to the public health emergency for the COVID-19 pandemic, Medicare removed the requirement that COVID-19 tests and certain, defined respiratory pathogen tests be ordered by a treating physician.  Under the interim policy, Medicare covered COVID-19 tests and certain, defined respiratory pathogen tests when ordered by any health care professional

4

1  authorized to do so under state law.  Under the interim policy,

2  COVID-19 tests and respiratory pathogen tests still had to be

3  reasonable and medically necessary for the treatment of illness or

4  injury, eligible for reimbursement, provided as documented, and not

5  procured through the payment of kickbacks and bribes in order to be

6  covered by Medicare.

7        Medicare Enrollment

8        18.  To participate in Medicare, providers, including clinical

9  laboratories, were required to submit an application in which the

10  provider agreed to comply with all Medicare-related laws and

11  regulations, including the Federal Anti-Kickback Statute, 42 U.S.C.

12  § 1320a-7b(b), which prohibited the offering, paying, soliciting, or

13  receiving of any remuneration in exchange for a patient referral or

14  the referral of other business for which payment may be made by any

15  Federal health care program.  Providers further agreed not to submit

16  claims for payment to Medicare knowing they were false or fraudulent

17  or with deliberate ignorance or reckless disregard of their truth or

18  falsity.  If Medicare approved the application, Medicare assigned the

19  provider an identifying number, which enabled the provider to submit

20  claims to Medicare for reimbursement for services provided to

21  Medicare beneficiaries.

22        19.  In order to maintain active enrollment status, and as a

23  condition of participation in Medicare, a clinical laboratory was

24  required to report changes in enrollment information within 90

25  days.  This included (i) reporting any change of ownership or control

26  interest, and (ii) identifying persons with an ownership or control

27  interest, as well as officers, directors, and managing employees, who

28  had been convicted of a federal or state health care fraud or

kickback offense or had been excluded from participation in Medicare. 42 U.S.C. § 1320a-3; 42 C.F.R. § 424.516(e).

20.   A person with an "ownership or control interest" was defined, with respect to an entity, as a person with a direct or indirect ownership interest of 5 percent or more, or an officer or director of the entity.  42 U.S.C. § 1320a-3(a)(3)(A)(i), (B); 42 C.F.R. § 424.502.  A managing employee was defined as a "general manager, business manager, administrator, director, or other individual that exercises operational or managerial control over, or who directly or indirectly conducts the day-to-day operations of the provider or supplier[.]"  *Id*. § 1320a-5(b).

21.   For certain types of providers, including clinical laboratories, the application to enroll in Medicare or make changes to enrollment was known as Form CMS-855B.  Among other information, Form CMS-855B contained spaces for a provider to identify persons who have 5 percent or greater direct or indirect ownership interest, and all managing employees, including "a general manager, business manager, administrator, director, or other person who exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operations . . . regardless of whether the individual is a W-2 employee of the supplier."  Form CMS-855B further provided space for disclosure of any final adverse legal action, including the federal or state agency or court/administrative body that imposed an action, against any of the persons identified as having ownership interest and/or managing control of the provider.

22.   Certain providers, including clinical laboratories, were required to resubmit and recertify the accuracy of their enrollment information every five years.  Among the types of information

required to be provided were changes in ownership interest and/or managing control, including listing individuals who were five percent or greater direct/indirect owners, authorized or delegated officials, partners, directors/officers, contracted managing employees, and managing employees.  42 C.F.R. § 424.515.  Form CMS 855B also required disclosure of whether any individuals who were added as persons with ownership interest and/or managing control were the subject of final adverse legal action as described above.

Exclusion From Federal Health Care Programs

23.  HHS was required to exclude any individual or entity from participating in all Federal health care programs upon conviction for certain crimes, including a criminal offense related to the delivery of an item or service under Medicare or any State health care program, or a felony conviction related to health care fraud or other financial misconduct ("mandatory exclusion").  42 U.S.C. § 1320a-7(a).

24.  HHS also possessed discretionary exclusion authority.  HHS could exclude an entity from participation in Medicare under certain circumstances, including where a person who had a direct or indirect ownership or control interest of 5 percent or more in the entity, or was an officer, director, agent, or managing employee of the entity, (i) had been convicted of certain crimes, including all crimes that would subject a person to mandatory exclusion, or (ii) had been excluded from participation in Federal health care programs.  42 U.S.C. § 1320a-7(b)(8).  HHS could also exclude any entity that did not fully and accurately make any disclosure required by 42 U.S.C. § 1320a-3.  42 U.S.C. § 1320a-7(b)(9).

25.   The effect of exclusion was to prohibit the payment by any Federal health care program for any items or services the excluded person or entity furnished, ordered, or prescribed in any capacity. Excluded persons were also prohibited from furnishing administrative and management services, including health information technology services, strategic planning, billing, and human resources, even if the services did not directly involve patient care or the provision of any health care related services.

26.   A provider initially enrolling in Medicare or revalidating its enrollment was required to disclose any affiliation it had at the time, or within the previous five years, with a Medicare provider or supplier that been excluded from participation in Medicare.   42 C.F.R. § 424.519(b).

27.   Reinstatement following exclusion from Medicare was not automatic.   An excluded person was required to apply for and be granted reinstatement by HHS.

Defendants SHAMS and NAVARRO's Convictions and Exclusion

28.   On or about August 23, 1990, the United States District Court for Eastern District of New York entered a judgment of conviction against defendant SHAMS, in case no. 9:89-cr-667, for Medicaid fraud.

29.   On or about July 22, 1991, as a consequence of defendant SHAMS's conviction in the Eastern District of New York, the Department of Health and Human Services, Office of Inspector General ("HHS-OIG") excluded defendant SHAMS from participation in Medicare, Medicaid, and all other Federal health care programs for a period of five years.   At the time of the exclusion, HHS-OIG informed defendant SHAMS in writing that the effect of the exclusion included that no

payment would be made to any entity in which he served as an employee, administrator, operator, or in any other capacity for any services furnished after the effective date of the exclusion, and further informed him that in order to apply for reinstatement, he must make a request in writing to HHS-OIG, which would notify him about any decision on reinstatement.

30.   On or about December 20, 2001, the Superior Court of California, County of Orange, in case nos. 00WF1386FA, 00WF0152FA, 00WF1387FA, 00WF1385FA, and 00WF1763FA, entered a judgment of conviction against defendant SHAMS for felony grand theft related to billing fraud involving Medicare and the Medi-Cal program, a state health care program as defined by 42 U.S.C. § 1320a-7(h) that provided free or reduced cost health care benefits to low income and other qualifying persons in California.

31.   On or about August 19, 2004, as a consequence of defendant SHAMS's conviction in the Orange County Superior Court, HHS-OIG excluded defendant SHAMS from participation in Medicare, Medicaid, and all other Federal health care programs for a period of ten years. At the time of the exclusion, HHS-OIG informed defendant SHAMS in writing that the effect of the exclusion included that no payment would be made to any employer for anything that he did, ordered, or prescribed to program patients.  HHS-OIG further informed him that reinstatement was not automatic, that he would have to apply in writing to HHS-OIG for reinstatement, and that he would have to await a decision by HHS-OIG on his reinstatement.

32.   Defendant SHAMS did not apply to HHS-OIG for reinstatement following the 1991 and 2004 exclusions, and he remained an excluded individual.

33.  On or about November 16, 2017, in case no. 17-cr-558, in the United States District Court for the Eastern District of New York, defendant SHAMS entered a plea of guilty to an Information charging conspiracy to commit money laundering, conspiracy to receive and pay health care kickbacks, and conspiracy to defraud by obstructing the lawful functions of the Internal Revenue Service.

34.  On or about May 23, 2000, the Superior Court of California, County of Orange, in case nos. GA040021, GA040022, DJ00WF0152, and LA035275, entered judgments of conviction against defendant NAVARRO for felony grand theft related to billing fraud involving the Medicare and Medi-Cal programs.

35.  On or about September 30, 2002, as a consequence of defendant NAVARRO's conviction in the Orange County Superior Court, HHS-OIG excluded defendant NAVARRO from participation in Medicare, Medicaid, and all other federal health care programs for a period of 15 years.  At the time of the exclusion, HHS-OIG informed defendant NAVARRO in writing that the effect of the exclusion included that no payment would be made to any employer for anything that she did, ordered, or prescribed to program patients.  HHS-OIG further informed her that reinstatement was not automatic, that she would have to apply in writing to HHS-OIG for reinstatement, and that she would have to await a decision by HHS-OIG on her reinstatement.

36.  On or about November 6, 2018, defendant NAVARRO submitted a false and fraudulent Application for Reinstatement to Federal Health Care Programs to HHS-OIG that falsely stated she had not owned or operated a health care entity, or served as a manager, administrator, or director of any entity that furnished health care items or services, during the period of her exclusion.  In reliance on this

1  false and fraudulent application, on or about December 14, 2018, HHS-

2  OIG reinstated defendant NAVARRO.

3  B.   OBJECT OF THE CONSPIRACY

4      37.  Beginning in or around the middle of 2018, and continuing

5  through April 19, 2022, in Los Angeles County, within the Central

6  District of California, and elsewhere, defendants SHAMS and NAVARRO

7  knowingly conspired with one another, Marketer A, and others known

8  and unknown to the Grand Jury, to commit health care fraud, in

9  violation of Title 18, United States Code, Section 1347.

10  C.   THE MANNER AND MEANS OF THE CONSPIRACY

11      38.  The object of the conspiracy was carried out, and to be

12  carried out, in substance, as follows:

13          a.   Defendants SHAMS and NAVARRO, despite being excluded

14  from participation in all Federal health care programs, maintained an

15  ownership interest in, exercised management and control of, and

16  provided administrative and management services to, Matias, a

17  provider that submitted claims for reimbursement of laboratory

18  testing services to Medicare and other Federal health care programs.

19          b.   Defendants SHAMS and NAVARRO, for the purpose of

20  enabling Matias to maintain billing privileges and receive

21  reimbursements from Medicare and other Federal health care programs,

22  fraudulently concealed defendant SHAMS and NAVARRO's role in Matias

23  from Medicare by failing to submit enrollment information disclosing

24  (i) defendants SHAMS and NAVARRO's assumption of an ownership and

25  control interest, (ii) defendants SHAMS and NAVARRO's status as

26  excluded persons, and (iii) defendants SHAMS and NAVARRO's prior

27  convictions of multiple federal and state health care fraud offenses.

28

1        c.   Defendants SHAMS and NAVARRO fraudulently submitted

2 and caused to be submitted to Medicare enrollment and other documents

3 that: (i) falsely identified Individual A as the only person with a 5

4 percent or greater ownership interest or managing control in Matias;

5 (ii) falsely identified Individual A and Individual B as the only

6 officers of Matias; (iii) concealed and disguised defendants SHAMS

7 and NAVARRO's ownership, control, managerial positions, and roles in

8 Matias; and (iv) concealed and disguised defendants SHAMS and

9 NAVARRO's prior convictions.

10        d.   Defendants SHAMS and NAVARRO fraudulently submitted

11 and caused to be submitted to the California Department of Public

12 Health documents that: (i) falsely stated that no individuals who

13 were managing employees of the laboratory had designated criminal

14 convictions; and (ii) concealed and disguised defendants SHAMS and

15 NAVARRO's roles as officers, directors, or persons responsible to

16 manage or conduct the day-to-day operations of Matias.

17        e.   Defendants SHAMS and NAVARRO paid and caused to be

18 paid illegal kickbacks and bribes to Marketer A and others in

19 exchange for specimens and doctors' orders, so that Matias could

20 perform laboratory tests and submit claims for reimbursement to

21 Federal health care programs, including Medicare.

22        f.   Defendant SHAMS, while under federal court supervision

23 in the Eastern District of New York as a result of his 2017 guilty

24 pleas, made false statements and material omissions to the United

25 States Probation Office and Pretrial Services Agency in regard to his

26 employment and income, in order to conceal his association with

27 Matias and enable Matias to continue receiving reimbursements from

28 Medicare and other Federal health care programs.

g.   Defendant NAVARRO, in an Application for Reinstatement to Federal Health Care Program Participation submitted to HHS on or about November 6, 2018, concealed her association with and management of Matias so that Matias could continue receiving reimbursements from Medicare and other Federal health care programs.

h.   As the effects of the COVID-19 pandemic began to be felt in the United States and many patients faced difficulty obtaining access to COVID-19 testing, defendants SHAMS and NAVARRO and others used the COVID-19 pandemic as an opportunity to expand the pre-existing conspiracy and to capitalize on a national emergency for their own financial gain by billing for COVID-19 testing and bundling the COVID-19 test with more expensive respiratory testing that did not identify or test for COVID-19, irrespective of whether the testing was medically necessary.

i.   Defendants SHAMS and NAVARRO caused Medicare's reimbursements on Matias' fraudulent claims to be deposited into Matias' bank accounts, from which defendants SHAMS and NAVARRO made large cash withdrawals and caused transfers to be made to other bank accounts they controlled to fund purchases of real estate, luxury items, travel, and household expenses.

39.   Between approximately August 2018 and March 2022, defendants SHAMS and NAVARRO caused Matias to submit to Medicare false and fraudulent claims in the approximate amount of $214,274,998 for laboratory tests, including COVID-19 and respiratory pathogen tests, that were ineligible for reimbursement and procured through the payment of illegal kickbacks and bribes, and without regard for the medical necessity of such tests.  As a result of these false and

fraudulent claims, Medicare made payments to Matias in the approximate amount of $29,223,869.

40.  Of the amounts set forth in paragraph 39, defendants SHAMS and NAVARRO caused Matias to submit to Medicare, after the onset of the COVID-19 pandemic, false and fraudulent claims in the approximate amount of $143,418,715 for COVID-19, respiratory pathogen, and other tests for those Medicare beneficiaries who received COVID-19 tests, resulting in Medicare reimbursing Matias in the approximate amount of $18,038,814 for these tests.

1

COUNT TWO

[18 U.S.C. § 371]

[ALL DEFENDANTS]

41.  The Grand Jury incorporates paragraphs 1 through 36 and 38 through 40 of this Indictment here.

A.  OBJECTS OF THE CONSPIRACY

42.  Beginning in or around the middle of 2018, and continuing through in or around April 19, 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendants SHAMS and NAVARRO knowingly conspired with one another, Marketer A, and others known and unknown to the Grand Jury, to do the following:

a.   To defraud the United States and an agency thereof by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of HHS and CMS in their administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371;

b.   to knowingly and willfully solicit and receive remuneration in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B); and

c.   to knowingly and willfully offer to pay and pay any remuneration to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

B.   THE MANNER AND MEANS OF THE CONSPIRACY

43.   The objects of the conspiracy were carried out, and to be carried out, in substance, as set forth in paragraph 38 of this Indictment.

C.   OVERT ACTS

44.   On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants SHAMS and NAVARRO, Marketer A, and others committed, and willfully caused others to commit, the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:   On July 24, 2018, defendants SHAMS and NAVARRO met with Marketer A in Las Vegas, Nevada, and provided a contract pursuant to which Marketer A would be paid illegal kickbacks and bribes in the form of a percentage of the reimbursements received by Matias, including from Federal health care programs, in exchange for Marketer A arranging for specimens and doctors' orders to be provided to Matias so that Matias could perform laboratory tests and submit false and fraudulent claims for payment to Medicare.

Overt Act No. 2:   On November 2, 2018, defendants SHAMS and NAVARRO caused a check in the approximate amount of $5,000, drawn on the Matias WF x7139 bank account, to be deposited into a bank account controlled by Marketer A, in exchange for Marketer A arranging to obtain specimens and doctors' orders and providing them to Matias for testing.

Overt Act No. 3:   On January 11, 2019, defendants SHAMS and NAVARRO caused a check in the approximate amount of $15,000, drawn on the Matias WF x7139 bank account, to be deposited into a bank account controlled by Marketer A, in exchange for Marketer A arranging to

obtain specimens and doctors' orders and providing them to Matias for testing.

Overt Act No. 4:   On June 17, 2019, defendants SHAMS and NAVARRO caused a check in the approximate amount of $15,000, drawn on the Matias EW x5549 bank account, to be deposited into a bank account controlled by Marketer A, in exchange for Marketer A arranging to obtain specimens and doctors' orders and providing them to Matias for testing.

Overt Act No. 5:   On October 15, 2019, defendant SHAMS caused a check in the approximate amount of $10,000, drawn on the Matias EW x5549 bank account, to be deposited into a bank account controlled by Marketer A, in exchange for Marketer A arranging to obtain specimens and doctors' orders and providing them to Matias for testing.

COUNTS THREE AND FOUR

[42 U.S.C. § 1320a-7b(b)(2)(B), 18 U.S.C. § 2]

[ALL DEFENDANTS]

45.  The Grand Jury incorporates paragraphs 1 through 36 and paragraph 38 through 40 of this Indictment here.

46.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants SHAMS and NAVARRO, together with others known and unknown to the Grand Jury, each aiding and abetting one another, knowingly and willfully offered and paid, and caused to be offered and paid, remuneration, namely, checks in the amounts identified below, which constituted kickbacks and bribes, to the individual listed below, to induce such individual to order, and arrange for and recommend ordering, a service, namely laboratory testing, for which payment may be made in whole and in part under a Federal health care program, namely, Medicare:

| COUNT | APPROX. DATE | PAYOR | PAYEE | APPROX. AMOUNT |
|-------|--------------|-------|-------|----------------|
| THREE | January 11, 2019 | Matias | Marketer A | $15,000 (WF x7139 check no. 3123) |
| FOUR | June 17, 2019 | Matias | Marketer A | $15,000 (EW x5549 check no. 3542) |

COUNT FIVE

[42 U.S.C. § 1320a-7b(a)(3)(i); 18 U.S.C. § 2]

[DEFENDANT SHAMS]

47.  The Grand Jury incorporates paragraphs 1 through 36 and 38 through 40 of this Indictment here.

48.  On or about May 12, 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant SHAMS, together with others known and unknown to the Grand Jury, each aiding and abetting each other, having knowledge of the occurrence of an event affecting defendant SHAMS's initial and continued right to a payment, and of the initial and continued right to a payment of any other individual on whose behalf defendant SHAMS applied for and received such payment, knowingly and willfully concealed and failed to disclose, and caused to be concealed, such event, namely, defendant SHAMS's exclusion from Medicare and subsequent conviction in 2017, with an intent to fraudulently secure such payment in a greater amount and quantity than was due and when no such payment was authorized.

1

COUNT SIX

2

[18 U.S.C. § 1956(h)]

3

[ALL DEFENDANTS]

4     49.   The Grand Jury incorporates paragraphs 1 through 36 and 38

5 through 40 of this Indictment here.

6     50.   Nurse Plus, dba Specialty Infusion Services ("Nurse Plus"),

7 was a California corporation with an address at 3345 Wilshire

8 Boulevard, Suite 407, Los Angeles, California 90010.  Defendant

9 NAVARRO owned, controlled, and operated Nurse Plus.

10     51.   Proworx LLC ("Proworx") was a Delaware company, registered

11 to do business in New York, with an address at 41 El Camino Loop,

12 Staten Island, New York 10309.  Defendant NAVARRO owned, controlled,

13 and operated Proworx.

14 A.   OBJECTS OF THE CONSPIRACY

15     52.   Beginning in or around the middle of 2018, and continuing

16 through April 19, 2022, in Los Angeles County, within the Central

17 District of California, and elsewhere, defendants SHAMS and NAVARRO,

18 along with others known and unknown to the Grand Jury, knowingly

19 conspired to commit the following offenses against the United States:

20          a.   Knowing that property involved in financial

21 transactions affecting interstate and foreign commerce represented

22 the proceeds of some form of unlawful activity, and which property

23 was, in fact, the proceeds of a specified unlawful activity, namely,

24 conspiracy to commit health care fraud, in violation of 18 U.S.C.

25 § 1349; illegal remuneration for health care referrals, in violation

26 of 42 U.S.C. § 1320a-7b(b)(2)(B); and false statements, in violation

27 of 42 U.S.C. § 1320a-7b(a)(3)(i), conducting, attempting to conduct,

28 and willfully causing others to conduct and attempt to conduct

20

financial transactions affecting interstate commerce, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

        b.   knowingly engaging and attempting to engage in monetary transactions involving criminally derived property of a value greater than $10,000, which property represented the proceeds of specified unlawful activity, namely, conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; illegal remuneration for health care referrals, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B); and false statements, in violation of 42 U.S.C. § 1320a-7b(a)(3)(i), in violation of Title 18, United States Code, Section 1957.

B.   <u>THE MANNER AND MEANS OF THE CONSPIRACY</u>

    53.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

        a.   As described in paragraph 38 of this Indictment, defendants SHAMS and NAVARRO caused the submission of false and fraudulent claims to Medicare, resulting in Medicare depositing payments for those claims into Matias's bank account.

        b.   Defendants SHAMS and NAVARRO withdrew, transferred, and caused the transfer of Medicare funds that were deposited into the Matias WF x7139 account and the Matias EW x5549 account, which constituted the proceeds of conspiracy to commit health care fraud, illegal remuneration for health care referrals, and false statements, as follows:

                i.   Defendants SHAMS and NAVARRO made and caused to

21

1  be made cash withdrawals, often in excess of $10,000.

2              ii.  Defendants SHAMS and NAVARRO transferred and
3  caused to be transferred funds for the purpose of engaging in real
4  estate transactions involving properties in the names of other
5  individuals.

6              iii. Defendants SHAMS and NAVARRO transferred and
7  caused to be transferred funds to bank accounts controlled by
8  defendant NAVARRO in the names of Nurse Plus and Proworx, which were
9  shell companies controlled by defendant NAVARRO, after which
10 defendants SHAMS and NAVARRO made and caused to be made further
11 transfers out of those accounts, often in amounts exceeding $10,000,
12 to fund real estate transactions and to purchase luxury items and
13 goods and services for their personal use.

14             iv.  Defendants SHAMS and NAVARRO transferred and
15 caused to be transferred funds to an account at East West Bank ending
16 in 6273, in the name of defendant SHAMS, who in turn made multiple
17 transfers out of the account in excess of $10,000, including a wire
18 transfer to an overseas location.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(7)]

1.    Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Five of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)    All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

(b)    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1

2

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(1)]

3    1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States will seek

5  forfeiture as part of any sentence, pursuant to Title 18, United

6  States Code, Section 982(a)(1), in the event of any defendant's

7  conviction of the offense set forth in Count Six of this Indictment.

8    2.   Any defendant, if so convicted, shall forfeit to the United

9  States of America the following:

10       (a)   Any property, real or personal, involved in such

11  offense, and any property traceable to such property; and

12       (b)   To the extent such property is not available for

13  forfeiture, a sum of money equal to the total value of the property

14  described in subparagraph (a).

15    3.   Pursuant to Title 21, United States Code, Section 853(p), as

16  incorporated by Title 28, United States Code, Section 982(b)(1), and

17  Title 18, United States Code, Section 982(b)(2), the defendant, if so

18  convicted, shall forfeit substitute property, if, by any act or

19  omission of the defendant, the property described in the preceding

20  paragraph, or any portion thereof (a) cannot be located upon the

21  exercise of due diligence; (b) has been transferred, sold to, or

22  deposited with a third party; (c) has been placed beyond the

23  jurisdiction of the court; (d) has been substantially diminished in

24  value; or (e) has been commingled with other property that cannot be

25  divided without difficulty.  Substitution of assets shall not be

26  ordered, however, where the convicted defendant acted merely as an

27  intermediary who handled but did not retain the property in the

28  course of the money laundering offense unless the defendant, in

committing the offense or offenses giving rise to the forfeiture,
conducted three or more separate transactions involving a total of
$100,000.00 or more in any twelve-month period.


                              A TRUE BILL


                              _____/S/_____
                              Foreperson

TRACY L. WILKISON
United States Attorney



SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

KRISTEN A. WILLIAMS
Assistant United States Attorney
Acting Chief, Major Frauds Section

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
U.S. Department of Justice

NIALL M. O'DONNELL
Assistant Chief, Fraud Section
U.S. Department of Justice

GARY A. WINTERS
RAYMOND E. BECKERING III
Trial Attorneys, Fraud Section
U.S. Department of Justice