**F I L E D**
CLERK, U.S. DISTRICT COURT

4/13/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10               June 2022 Grand Jury

11 | UNITED STATES OF AMERICA,      | CR 2:22-CR-154-SB -2

12 |          Plaintiff,            | F I R S T
                                    | S U P E R S E D I N G
13 |               v.               | I N D I C T M E N T

14 | LOURDES NAVARRO,               | [18 U.S.C. § 1349: Conspiracy to
       aka "Lulu,"                  | Commit Health Care Fraud and Wire
15 |                                | Fraud; 18 U.S.C. § 1347: Health
              Defendant.           | Care Fraud; 18 U.S.C. § 1956(h):
16 |                                | Conspiracy to Commit Money
                                    | Laundering; 18 U.S.C.
17 |                                | § 1001(a)(3): False Statements;
                                    | 18 U.S.C. §§ 982(a)(1) and
18 |                                | 982(a)(7): Criminal Forfeiture]

19

20

21

22

23

24

25

26

27

28

1        The Grand Jury charges:

2                              COUNT ONE

3                          [18 U.S.C. § 1349]

4  A.    INTRODUCTORY ALLEGATIONS

5        At times relevant to this First Superseding Indictment:

6        1.    'Matias' Clinical Laboratory, Inc., doing business as

7  ("dba") Health Care Providers Laboratory ("Matias"), was a clinical

8  testing laboratory located at 14411 Palmrose Avenue, Baldwin Park,

9  California 91706, within the Central District of California.

10       2.    Defendant LOURDES NAVARRO, also known as "Lulu," was a

11 resident of Glendale, California, within the Central District of

12 California, and New York.

13       3.    Defendant NAVARRO and her husband, Imran Shams ("Shams"),

14 owned, controlled, and operated Matias.

15       4.    Individual A and Individual B were, at various times,

16 listed on business records and corporate filings submitted by Matias

17 as President, Vice President, and Chief Financial Officer of Matias.

18       5.    Until in or around May 2019, Matias maintained a bank

19 account at Wells Fargo Bank, N.A. with an account number ending in

20 7139 ("WF x7139").  Beginning in or around May 2019 and continuing to

21 at least April 2022, Matias maintained a bank account at East West

22 Bank with an account number ending in 5549 ("EW x5549").  Defendant

23 NAVARRO and Shams controlled the WF x7139 and EW x5549 bank accounts.

24       6.    Wells Fargo Bank, N.A. and East West Bank were financial

25 institutions as defined in 18 U.S.C. § 20.

26       The Medicare Program

27       7.    The Medicare program ("Medicare") was a federally funded

28 health insurance program, affecting commerce, that provided benefits

                                    2

to individuals who were 65 years and older, and to certain disabled persons.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").  Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b) in that it was a public plan or contract affecting commerce, and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

8.  Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique number.

9.  Physicians, clinical laboratories, and other health care providers that provided medical services to beneficiaries that were to be reimbursed by Medicare were referred to as Medicare "providers" and "suppliers."

10.  Medicare was divided into different program "parts."  Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies; Part B was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, and laboratories; and Part C, known as the Medicare Advantage Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed care plans rather than through Parts A and B.

11.  Private health insurance companies offering Medicare Advantage plans were required to provide Medicare beneficiaries with the same services and supplies offered under Medicare Parts A and B. To be eligible to enroll in a Medicare Advantage plan, a person had to have been entitled to benefits under Medicare Parts A and B.

Medicare Coverage

12.   Medicare paid for claims only if the items or services were medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented.  Medicare would not pay for items or services that were procured through kickbacks and bribes.

13.   On January 31, 2020, HHS declared that, in light of confirmed cases of novel coronavirus disease 2019, commonly referred to as "COVID-19," a public health emergency existed nationwide.

14.   In or around May 2020, in response to the public health emergency for the COVID-19 pandemic, Medicare removed the requirement that COVID-19 tests and certain, defined respiratory pathogen tests be ordered by a treating physician.  Under the interim policy, Medicare covered COVID-19 tests and certain, defined respiratory pathogen tests when ordered by any health care professional authorized to do so under state law.  Under the interim policy, COVID-19 tests and respiratory pathogen tests still had to be reasonable and medically necessary for the treatment of illness or injury, eligible for reimbursement, provided as documented, and not procured through the payment of kickbacks and bribes in order to be covered by Medicare.

Medicare Enrollment

15.   In order to receive payment for covered items and services furnished to Medicare beneficiaries, providers and suppliers, including clinical laboratories, were required to submit a Medicare enrollment application, CMS Form 855B, in which the supplier certified its compliance with all Medicare-related laws and regulations, including the Federal Anti-Kickback Statute, 42 U.S.C.

§ 1320a-7b(b), which prohibited the offering, paying, soliciting, or receiving of any remuneration in exchange for a patient referral or the referral of other business for which payment may be made by any Federal health care program.  Providers and suppliers further agreed not to submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.  If Medicare approved the application, the providers and suppliers were permitted to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

16.  In order to maintain active enrollment status, and as a condition of participation in Medicare, a clinical laboratory was required to report changes in enrollment information that involved any change of ownership or control interest within 30 days.  42 U.S.C. § 1320a-3; 42 C.F.R. § 424.516(e)(1).  A clinical laboratory was also required to certify that it did not employ an individual who had been excluded from participation in Medicare.  42 C.F.R. § 424.516(a)(3)(i).

17.  A person with an "ownership or control interest" was defined, with respect to an entity, as a person with a direct or indirect ownership interest of five percent or more, or an officer or director of the entity.  42 U.S.C. §§ 1320a-3(a)(3)(A)(i), (B).  A managing employee was defined as a "general manager, business manager, administrator, director, or other individual that exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operation of the provider or supplier, either under contract or through some other arrangement, whether or not the individual is a W-2 employer of the provider or supplier.  42 C.F.R. § 424.502.

18.   For certain types of suppliers, including clinical laboratories, the application to enroll in Medicare or make changes to enrollment was known as Form CMS-855B.  Among other information, Form CMS-855B contained spaces for a provider to identify persons who have five percent or greater direct or indirect ownership interest, and all managing employees, including "a general manager, business manager, administrator, director, or other person who exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operations . . . regardless of whether the individual is a W-2 employee of the supplier."  Form CMS-855B further provided space for disclosure of any final adverse legal action, including the federal or state agency or court/administrative body that imposed an action, against any of the persons identified as having ownership interest and/or managing control of the provider.

19.   Certain suppliers, including clinical laboratories, were required to resubmit and recertify the accuracy of their enrollment information every five years.  Among the types of information required to be provided were changes in ownership interest and/or managing control, including listing individuals who were five percent or greater direct/indirect owners, authorized or delegated officials, partners, directors/officers, contracted managing employees, and managing employees.  42 C.F.R. § 424.515.  Form CMS-855B also required disclosure of whether any individuals who were added as persons with ownership interest and/or managing control were the subject of final adverse legal action as described above.

The HRSA COVID-19 Uninsured Program

20.   The Families First Coronavirus Response Act ("FFCRA") was a federal law enacted on or about March 14, 2020, as part of the

6

federal government's initial response to the then-emerging COVID-19 pandemic.

21.   The FFCRA, among other things, appropriated funds to reimburse the cost of providing diagnostic testing and services for COVID-19 in individuals without health insurance.  These funds, and additional funds appropriated through subsequent legislation for testing, treatment, and vaccines for uninsured individuals, were distributed through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program ("HRSA COVID-19 Uninsured Program").

22.   The HRSA COVID-19 Uninsured Program was administered by HHS through its agency, the Health Resources and Services Administration ("HRSA").  HRSA contracted with UnitedHealth Group, a private insurance company, to handle claims administration and payments, which UnitedHealth Group performed through its unit Optum Health. Reimbursements by HRSA were provided on a rolling basis directly to eligible providers, including laboratories.  The HRSA COVID-19 Uninsured Program was a "health care benefit program" as defined in 18 U.S.C. § 24(b) in that it was a public plan or contract affecting commerce, and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

23.   In order to receive reimbursement under the HRSA COVID-19 Uninsured Program, a provider was required to attest to compliance with the Terms and Conditions of the program. The terms and conditions required the provider to submit truthful claims, in respect to uninsured individuals, for: (1) COVID-19 testing, which was defined as a test for the detection of SARS-CoV-2 or the

diagnosis of the virus that causes COVID-19, and/or testing-related items and services such as an office visit or a telehealth visit that resulted in the administration of a COVID-19 test; (2) care or treatment related to positive diagnoses of COVID-19, where COVID-19 was the primary reason for treatment; or (3) administering a COVID-19 vaccination.

24.   Providers seeking reimbursement under the HRSA COVID-19 Uninsured Program were required to enroll as a provider participant, check to ensure that patients were uninsured, submit claims and patient information electronically, and receive payment through direct deposit.  Reimbursements were generally made at Medicare rates.

25.   Claims submitted electronically to the COVID-19 Uninsured Program and payments made from the COVID-19 Uninsured Program were transmitted through interstate wires.

Exclusion From Federal Health Care Programs

26.   HHS was required to exclude any individual or entity from participating in all Federal health care programs upon conviction for certain crimes, including a criminal offense related to the delivery of an item or service under Medicare or any State health care program, or a felony conviction related to health care fraud or other financial misconduct ("mandatory exclusion").  42 U.S.C. § 1320a-7(a).

27.   HHS also possessed discretionary exclusion authority.  HHS could exclude an entity from participation in Medicare under certain circumstances, including where a person who had a direct or indirect ownership or control interest of five percent or more in the entity, or was an officer, director, agent, or managing employee of the

entity, (i) had been convicted of certain crimes, including all crimes that would subject a person to mandatory exclusion, or (ii) had been excluded from participation in Federal health care programs. 42 U.S.C. § 1320a-7(b)(8).  HHS could also exclude any entity that did not fully and accurately make any disclosure required by 42 U.S.C. § 1320a-3.  42 U.S.C. § 1320a-7(b)(9).

28.  The effect of exclusion was to prohibit the payment by any Federal health care program for any items or services the excluded person or entity furnished, ordered, or prescribed in any capacity. Excluded persons were also prohibited from furnishing administrative and management services, including health information technology services, strategic planning, billing, and human resources, even if the services did not directly involve patient care or the provision of any health care related services.

29.  Reinstatement following exclusion from Medicare was not automatic.  An excluded person was required to apply for and be granted reinstatement by HHS.

Convictions and Exclusions of Defendant NAVARRO and Shams

30.  On or about August 23, 1990, the United States District Court for Eastern District of New York entered a judgment of conviction against Shams, in case no. 9:89-cr-667, for Medicaid fraud.

31.  On or about July 22, 1991, as a consequence of Shams's conviction in the Eastern District of New York, the Department of Health and Human Services, Office of Inspector General ("HHS-OIG") excluded Shams from participation in Medicare, Medicaid, and all other Federal health care programs for a period of five years.  At the time of the exclusion, HHS-OIG informed Shams in writing that the

effect of the exclusion included that no payment would be made to any entity in which he served as an employee, administrator, operator, or in any other capacity for any services furnished after the effective date of the exclusion, and further informed him that in order to apply for reinstatement, he must make a request in writing to HHS-OIG, which would notify him about any decision on reinstatement.

32.   On or about December 20, 2001, the Superior Court of California, County of Orange, in case nos. 00WF1386FA, 00WF0152FA, 00WF1387FA, 00WF1385FA, and 00WF1763FA, entered a judgment of conviction against Shams for felony grand theft related to billing fraud involving Medicare and the Medi-Cal program, a State health care program as defined by 42 U.S.C. § 1320a-7(h) that provided free or reduced cost health care benefits to low income and other qualifying persons in California.

33.   On or about August 19, 2004, as a consequence of Shams's conviction in the Orange County Superior Court, HHS-OIG excluded Shams from participation in Medicare, Medicaid, and all other Federal health care programs for a period of ten years.  At the time of the exclusion, HHS-OIG informed Shams in writing that the effect of the exclusion included that no payment would be made to any employer for anything that he did, ordered, or prescribed to program patients. HHS-OIG further informed him that reinstatement was not automatic, that he would have to apply in writing to HHS-OIG for reinstatement, and that he would have to await a decision by HHS-OIG on his reinstatement.

34.   Shams did not apply to HHS-OIG for reinstatement following the 1991 and 2004 exclusions, and he remained an excluded individual.

35.   On or about November 16, 2017, in case no. 17-cr-558, in the United States District Court for the Eastern District of New York, Shams entered a plea of guilty to an Information charging conspiracy to commit money laundering, conspiracy to receive and pay health care kickbacks, and conspiracy to defraud by obstructing the lawful functions of the Internal Revenue Service.

36.   On or about May 23, 2000, the Superior Court of California, County of Orange, in case nos. GA040021, GA040022, DJ00WF0152, and LA035275, entered judgments of conviction against defendant NAVARRO for felony grand theft related to billing fraud involving the Medicare and Medi-Cal programs.

37.   On or about September 30, 2002, as a consequence of defendant NAVARRO's conviction in the Orange County Superior Court, HHS-OIG excluded defendant NAVARRO from participation in Medicare, Medicaid, and all other federal health care programs for a period of 15 years.  At the time of the exclusion, HHS-OIG informed defendant NAVARRO in writing that the effect of the exclusion included that no payment would be made to any employer for anything that she did, ordered, or prescribed to program patients.  HHS-OIG further informed her that reinstatement was not automatic, that she would have to apply in writing to HHS-OIG for reinstatement, and that she would have to await a decision by HHS-OIG on her reinstatement.

Reinstatement of Defendant NAVARRO

38.   On or about September 27, 2018, 16 years after defendant NAVARRO had been excluded from Medicare, defendant NAVARRO, indicating an address in the Central District of California, submitted a letter to HHS-OIG requesting reinstatement to Medicare.

39.  On or about October 1, 2018, HHS-OIG responded in a letter to defendant NAVARRO, at an address in the Central District of California, stating that in order to apply for reinstatement, defendant NAVARRO was required to respond to each question in an Application for Reinstatement to Federal Health Care Program Participation ("Application for Reinstatement") and provide her entire work history since the effective date of the exclusion, including "all health care employment."  The letter advised that defendant NAVARRO could not participate "in any capacity, in the Medicare, Medicaid, or any Federal health care programs" until HHS-OIG provided written notice of reinstatement.

40.  On or about November 6, 2018, defendant NAVARRO submitted a false and fraudulent Application for Reinstatement to HHS-OIG that falsely stated, among other things, that defendant NAVARRO had not owned or operated a health care entity, or served as a manager, administrator, or director of any entity that furnished health care items or services, during the period of her exclusion.  In reliance on this false and fraudulent application, on or about December 14, 2018, HHS-OIG reinstated defendant NAVARRO.

Insurance Company-1

41.  Insurance Company-1 was an integrated health management organization that provided health care and health care coverage to its members in California and other states. In addition to providing coverage to its members, Insurance Company-1 contracted with CMS to provide managed care to Medicare Advantage beneficiaries through various plans.

42.   Insurance Company-1 was a "health care benefit program" as defined in 18 U.S.C. § 24(b), in that it was a private plan or contract affecting commerce.

43.   Insurance Company-1 reimbursed physicians, clinical laboratories, and other health care providers for medical items and services provided to members of Insurance Company-1 and Medicare Advantage beneficiaries enrolled in its various plans, and paid for claims only if the items and services were medically necessary and provided as represented.

Laboratory Testing

44.   Clinical laboratories such as Matias performed various types of tests, such as toxicology screens, urinalysis, routine blood work, and tests for respiratory pathogens.  These tests were performed on urine, blood, and saliva samples, and nasal swabs ("specimens").  Physicians, nurse practitioners, and other authorized providers could issue orders ("doctors' orders") for laboratory testing for Medicare beneficiaries and other patients.

45.   Laboratories could perform tests to detect whether an individual had COVID-19.  Laboratories could also perform tests to detect a variety of viral and bacterial respiratory pathogens.  Tests for respiratory pathogens were sometimes performed in "panels" that targeted multiple pathogens, known as a respiratory pathogen panel ("RPP").  Panels could be designed to test different numbers of pathogens, and could also include a test for COVID-19.

46.   Claims for reimbursement of laboratory tests were submitted to Medicare, other Federal health care programs, and private insurers using Common Procedural Terminology ("CPT") codes, a set of standardized codes used by medical professionals, laboratories, and

other medical providers to describe the services they provided. There were CPT codes for RPPs that targeted multiple pathogens, as well as codes for the individual pathogens that could be included in a panel.

47.   In general, the amounts Medicare, HRSA, and private insurers reimbursed laboratories for RPP and other respiratory pathogen testing were several times higher than the amounts they reimbursed for COVID-19 testing.

B.   OBJECTS OF THE CONSPIRACY

48.   Beginning in or around the middle of 2018, and continuing through April 19, 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant NAVARRO knowingly conspired with Shams and others known and unknown to the Grand Jury, to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Sections 1347 and 1343.

C.   THE MANNER AND MEANS OF THE CONSPIRACY

49.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a.   Defendant NAVARRO and Shams, despite being excluded from participation in all Federal health care programs, maintained an ownership interest in, exercised management and control of, and provided administrative and management services to, Matias, a provider that submitted claims for reimbursement of laboratory testing services to Medicare and other Federal health care programs.

b.   Defendant NAVARRO and Shams, for the purpose of enabling Matias to maintain billing privileges and receive reimbursements from Medicare and other Federal health care programs, fraudulently concealed defendant NAVARRO and Shams's roles in Matias

from Medicare by failing to submit enrollment information disclosing: (i) defendant NAVARRO and Shams's assumption of an ownership and control interest; (ii) defendant NAVARRO and Shams's status as excluded persons; and (iii) defendant NAVARRO and Shams's prior convictions of multiple federal and state health care fraud offenses.

c.   Defendant NAVARRO and Shams fraudulently submitted and caused to be submitted to Medicare enrollment and other documents that: (i) falsely identified Individual A as the only person with a five percent or greater ownership interest or managing control in Matias; (ii) falsely identified Individual A and Individual B as the only officers of Matias; (iii) concealed and disguised defendant NAVARRO and Shams's ownership, control, managerial positions, and roles in Matias; and (iv) concealed and disguised defendant NAVARRO and Shams's prior convictions.

d.   Defendant NAVARRO and Shams fraudulently submitted and caused to be submitted to the California Department of Public Health documents that: (i) falsely stated that no individuals who were managing employees of the laboratory had designated criminal convictions; and (ii) concealed and disguised defendant NAVARRO and Shams's roles as officers, directors, or persons responsible to manage or conduct the day-to-day operations of Matias.

e.   Defendant NAVARRO, in an Application for Reinstatement submitted to HHS-OIG on or about November 6, 2018, falsely concealed her operation and management of Matias, and made other false statements, so that Matias could continue receiving reimbursements from Medicare and other Federal health care programs.

f.   Defendant NAVARRO and Shams paid and caused to be paid illegal kickbacks and bribes to purported marketers and others in

exchange for specimens and doctors' orders, so that Matias could perform laboratory tests, including COVID-19 and RPP tests, and submit claims for reimbursement to Federal health care programs, including Medicare and HRSA.

g.   After the COVID-19 pandemic began, defendant NAVARRO and Shams obtained nasal swab specimens that enabled Matias to test for the presence of SARS-CoV-2, the virus that causes COVID-19 (the "COVID-19 Specimens"), as well as testing orders from physicians and other medical professionals.  The COVID-19 Specimens were collected from, among others, residents and staff at nursing homes, assisted living facilities, rehabilitation facilities, and similar types of facilities, and from students and staff at schools in the Los Angeles area, for the purported purpose of conducting screening tests to identify and isolate individuals infected with COVID-19.

h.   Defendant NAVARRO and Shams routinely caused various RPP tests to be performed on the COVID-19 Specimens that had been collected for the purpose of performing COVID-19 screening tests, even though physicians and medical professionals ordered testing only for COVID-19, and even though it was not medically necessary to conduct RPP tests on asymptomatic individuals who were being screened to identify COVID-19 infections.

i.   Defendant NAVARRO and Shams submitted and caused to be submitted to Medicare, HRSA, and Insurance Company-1 false and fraudulent claims for the aforementioned RPP tests performed on the COVID-19 Specimens, in that the claims were submitted for tests that were not ordered as represented, medically unnecessary, procured through the payment of kickbacks and bribes, and ineligible for reimbursement.  The claims were submitted through CPT codes

representing panels of tests as well through CPT codes representing
individual respiratory pathogens.

       j.   Defendant NAVARRO and Shams caused the creation of
false and fraudulent test requisitions that purportedly reflected the
ordering of RPP tests, when in truth and in fact, physicians and
other medical professionals had ordered only COVID-19 tests.

       k.   Defendant NAVARRO and Shams caused false and
fraudulent claims for RPP tests to be submitted to HRSA by
representing that the tested individuals had been diagnosed with
COVID-19, when in truth and in fact, the individuals had not been
diagnosed with COVID-19 and the tests were for screening purposes
only.

       l.   Defendant NAVARRO and Shams caused Medicare, HRSA, and
Insurance Company-1's reimbursements on Matias' fraudulent claims to
be deposited into Matias' bank accounts, from which defendant NAVARRO
and Shams made large cash withdrawals and caused transfers to be made
to other bank accounts they controlled to fund purchases of real
estate, luxury items, travel, and household expenses.

   50.  Between approximately August 2018 and April 2022, defendant
NAVARRO and Shams caused Matias to submit to Medicare false and
fraudulent claims in the approximate amount of $234 million for
laboratory tests, including COVID-19 tests, RPP tests, and other
tests, that were not ordered as represented, medically unnecessary,
procured through the payment of kickbacks and bribes, and ineligible
for reimbursement.  As a result of these false and fraudulent claims,
Medicare made payments to Matias in the approximate amount of $31.7
million.

51.  Of the amounts set forth in paragraph 50, defendant NAVARRO and Shams caused Matias to submit to Medicare, after the onset of the COVID-19 pandemic, false and fraudulent claims in the approximate amount of $138 million for RPP tests that were not ordered as represented, medically unnecessary, procured through the payment of kickbacks and bribes, and ineligible for reimbursement.  As a result of these false and fraudulent claims, Medicare reimbursed Matias in the approximate amount of $16.9 million.

52.  Between approximately September 2020 and April 2022, defendant NAVARRO and Shams caused Matias to submit to HRSA, through interstate wire transmissions, false and fraudulent claims in the approximate amount of $182.8 million for RPP tests that were not ordered as represented, medically unnecessary, procured through the payment of kickbacks and bribes, and ineligible for reimbursement. As a result of these false and fraudulent claims, HRSA made payments to Matias in the approximate amount of $25.2 million.

53.  Between approximately June 2020 and December 2021, defendant NAVARRO and Shams caused Matias to submit to Insurance Company-1, for both Medicare Advantage beneficiaries and members insured directly by Insurance Company-1, false and fraudulent claims in the approximate amount of $38.4 million for RPP tests that were not ordered as represented, medically unnecessary, procured through the payment of kickbacks and bribes, and ineligible for reimbursement.  As a result of these false and fraudulent claims, Insurance Company-1 made payments to Matias in the approximate amount of $12.2 million.

54.  In total, defendant NAVARRO and Shams caused Matias to submit false and fraudulent claims to Medicare, HRSA, and Insurance

Company-1 in the approximate amount of $455.2 million, resulting in payments to Matias in the approximate amount of $69.1 million.

1        COUNTS TWO THROUGH SEVEN

2          [18 U.S.C. §§ 1347, 2(b)]

3    55.   The Grand Jury incorporates paragraphs 1 through 47 and 49

4 through 54 of this First Superseding Indictment here.

5 A.   THE SCHEME TO DEFRAUD

6    56.   Beginning in or around the middle of 2018, and continuing

7 through April 19, 2022, in Los Angeles County, within the Central

8 District of California, and elsewhere, defendant NAVARRO, together

9 with Shams and others known and unknown to the Grand Jury, each

10 aiding and abetting the others, knowingly, willfully, and with the

11 intent to defraud, executed a scheme and artifice: (1) to defraud

12 health care benefit programs, namely, Medicare, the HRSA COVID-19

13 Uninsured Program, and Insurance Company-1; and (2) to obtain money

14 from health care benefit programs, namely, Medicare, the HRSA COVID-

15 19 Uninsured Program, and Insurance Company-1, by means of materially

16 false and fraudulent pretenses, representations, and promises, and

17 the concealment of material facts, both in connection with the

18 delivery of and payment for health care benefits, items, and

19 services.

20    57.   The fraudulent scheme operated, in substance, as described

21 in paragraphs 50 through 55 of this First Superseding Indictment.

22 B.   EXECUTION OF THE SCHEME TO DEFRAUD

23    58.   On or about the dates set forth below, within the Central

24 District of California, and elsewhere, defendant NAVARRO, together

25 with Shams and others known and unknown to the Grand Jury, aiding and

26 abetting each other, knowingly and willfully executed and willfully

27 caused the execution of the fraudulent scheme described above by

28 submitting and causing to be submitted to Medicare, the HRSA COVID-19

Uninsured Program, and Insurance Company-1 the false and fraudulent claims identified below:

| COUNT | CLAIM NO. | APPROX. DATE CLAIM SUBMITTED | INSURER | SERVICES BILLED | APPROX. AMOUNT BILLED | APPROX. AMOUNT PAID | BENE-FICIARY |
|---|---|---|---|---|---|---|---|
| TWO | 551121209403360 | 07/28/2021 | Medicare | Respiratory pathogen testing | $2,829 | $448 | S.M. |
| THREE | 551121054050740 | 02/23/2021 | Medicare | Respiratory pathogen testing | $2,829 | $448 | J.G. |
| FOUR | 551121214260260 | 07/31/2021 | Medicare | Respiratory pathogen testing | $2,829 | $448 | E.C. |
| FIVE | DE02866393 | 01/20/2022 | HRSA | Respiratory pathogen testing | $2,217 | $306 | J.M. |
| SIX | DE33854122 | 01/28/2022 | HRSA | Respiratory pathogen testing | $2,217 | $306 | B.L. |
| SEVEN | 4017329880 | 05/13/2021 | Insurance Company-1 | Respiratory pathogen testing | $2,971 | $1,841 | L.H. |

1

2

COUNT EIGHT

[18 U.S.C. § 1956(h)]

60.  The Grand Jury incorporates paragraphs 1 through 47 and 49 through 54 of this First Superseding Indictment here.

61.  Nurse Plus, dba Specialty Infusion Services ("Nurse Plus"), was a California corporation with an address at 3345 Wilshire Boulevard, Suite 407, Los Angeles, California 90010.  Defendant NAVARRO owned, controlled, and operated Nurse Plus.

62.  Proworx LLC ("Proworx") was a Delaware company, registered to do business in New York, with an address at 41 El Camino Loop, Staten Island, New York 10309.  Defendant NAVARRO owned, controlled, and operated Proworx.

A.   OBJECTS OF THE CONSPIRACY

63.  Beginning in or around the middle of 2018, and continuing through April 19, 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant NAVARRO, Shams, and others known and unknown to the Grand Jury, knowingly conspired to commit the following offenses against the United States:

a.   Knowing that property involved in financial transactions affecting interstate and foreign commerce represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of a specified unlawful activity, namely, conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349, and health care fraud, in violation of 18 U.S.C. § 1347, conducting, attempting to conduct, and willfully causing others to conduct and attempt to conduct financial transactions affecting interstate commerce, knowing that the transactions were designed in whole and in part to conceal and disguise the nature,

22

location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.   knowingly engaging and attempting to engage in monetary transactions involving criminally derived property of a value greater than $10,000, which property represented the proceeds of specified unlawful activity, namely, conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349, and health care fraud, in violation of 18 U.S.C. § 1347, in violation of Title 18, United States Code, Section 1957.

B.   <u>THE MANNER AND MEANS OF THE CONSPIRACY</u>

64.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a.   As described in paragraphs 49 through 54 of this First Superseding Indictment, defendant NAVARRO and Shams caused the submission of false and fraudulent claims to Medicare, HRSA, and Insurance Company-1, resulting in those payors depositing payments for such claims into Matias's bank account.

b.   Defendant NAVARRO and Shams withdrew, transferred, and caused the transfer of Medicare, HRSA, and Insurance Company-1 funds that were deposited into the Matias WF x7139 account and the Matias EW x5549 account, which constituted the proceeds of conspiracy to commit health care fraud and wire fraud, and health care fraud, as follows:

i.   Defendant NAVARRO and Shams made and caused to be made cash withdrawals, often in excess of $10,000.

ii.   Defendant NAVARRO and Shams transferred and caused to be transferred funds for the purpose of engaging in real

estate transactions involving properties in the names of other individuals.

iii. Defendant NAVARRO and Shams transferred and caused to be transferred funds to bank accounts controlled by defendant NAVARRO in the names of Nurse Plus and Proworx, which were shell companies controlled by defendant NAVARRO, after which defendant NAVARRO and Shams made and caused to be made further transfers out of those accounts, often in amounts exceeding $10,000, to fund real estate transactions and to purchase luxury items and goods and services for their personal use.

iv.  Defendant NAVARRO and Shams transferred and caused to be transferred funds to an account at East West Bank ending in 6273, in the name of Shams, who in turn made multiple transfers out of the account in excess of $10,000, including a wire transfer to an overseas location.

COUNT NINE

[18 U.S.C. § 1001(a)(3)]

65.  The Grand Jury incorporates paragraphs 1 through 47 and 49 through 54 of this First Superseding Indictment here.

66.  On or about November 6, 2018, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, HHS-OIG, defendant NAVARRO knowingly and willfully made a false writing and document, namely, an Application for Reinstatement, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, as follows:

a.  In response to Question 8 on the Application for Reinstatement, which asked the respondent, "During your period of exclusion did you own any health care related entity, operate any health care related entity, or serve as a manager, administrator, or director of any entity that furnished health care services?" defendant NAVARRO wrote "NO."  In fact, as defendant NAVARRO knew, during the period of her exclusion, defendant NAVARRO had operated and managed entities that furnished health care services.

b.  In response to Question 16 on the Application for Reinstatement, which asked the respondent, "Please list **any and all** employment (health care, non-health care, part-time, self-employment, etc.) and **all periods of unemployment**" during the entire period of the exclusion "to the present," defendant NAVARRO wrote "2013 – onwards Housewife."  In fact, as defendant NAVARRO knew, between 2013 and the date of the Application, defendant NAVARRO had operated and managed entities that furnished health care services.

1                              FORFEITURE ALLEGATION ONE

2                            [18 U.S.C. § 982(a)(7)]

3      1.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is

4 hereby given that the United States will seek forfeiture as part of

5 any sentence, pursuant to Title 18, United States Code, Section

6 982(a)(7), in the event of the defendant's conviction of the offenses

7 set forth in any of Counts One through Seven or Count Nine of this

8 First Superseding Indictment.

9      2.   The defendant, if so convicted, shall forfeit to the United

10 States of America the following:

11          (a)   All right, title, and interest in any and all

12 property, real or personal, that constitutes or is derived, directly

13 or indirectly, from the gross proceeds traceable to the commission of

14 any offense of conviction; and

15          (b)   To the extent such property is not available for

16 forfeiture, a sum of money equal to the total value of the property

17 described in subparagraph (a).

18      3.   Pursuant to Title 21, United States Code, Section 853(p),

19 as incorporated by Title 18, United States Code, Section 982(b), the

20 defendant, if convicted shall forfeit substitute property, up to the

21 total value of the property described in the preceding paragraph if,

22 as a result of any act or omission of the defendant, the property

23 described in the preceding paragraph, or any portion thereof (a)

24 cannot be located upon the exercise of due diligence; (b) has been

25 transferred, sold to, or deposited with a third party; (c) has been

26 placed beyond the jurisdiction of the Court; (d) has been

27 substantially diminished in value; or (e) has been commingled with

28 other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of the defendant's conviction of the offense set forth in Count Eight of this First Superseding Indictment.

2.   The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)   Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the defendant acted merely as an intermediary who handled but did not retain the property in the course of the

money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

A TRUE BILL

/S/
Foreperson

E. MARTIN ESTRADA
United States Attorney

*Scott M. Garringer*
*Deputy Chief, Criminal Division For:*

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

GLENN S. LEON
Chief, Fraud Section
U.S. Department of Justice

NIALL M. O'DONNELL
Assistant Chief, Fraud Section
U.S. Department of Justice

GARY A. WINTERS
RAYMOND E. BECKERING III
Trial Attorneys, Fraud Section
U.S. Department of Justice